UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>v.<br><br>ESTATE OF RICHARD T. COLE, JR.,<br>et al.<br><br>        Defendants. | Case No. 22-cv-12916<br><br>Honorable Robert J. White |

**OPINION AND ORDER GRANTING THE GOVERNMENT'S MOTION
FOR SUMMARY JUDGMENT AND DENYING DEFENDANT ROBERT
W. BURLAND, JR.'S CROSS-MOTION FOR SUMMARY JUDGMENT**

I.      Introduction

The United States of America commenced this action pursuant to 26 U.S.C. § 7402(a) seeking to reduce trust-fund tax liabilities already assessed against Robert W. Burland, Jr. to judgment.[1]

---

[1] "A trust-fund tax is money withheld from an employee's wages (income tax, social security, and Medicare taxes) by an employer and held in trust until paid to the Treasury." *Byrne v. United States*, 857 F.3d 319, 321 n.1 (6th Cir. 2017) (quotation omitted).  The record includes references to "trust-fund taxes," "withholding taxes," "withheld employment taxes," and "civil penalties."  These terms are used interchangeably.  They all refer to the same underlying tax debt.

Before the Court are the parties cross-motions for summary judgment and the associated responses and replies. (ECF Nos. 46-47, 56, 58, 63-64).  The Court will decide the cross-motions without a hearing pursuant to E.D. Mich. LR 7.1(f)(2).  For the following reasons, (1) the government's summary judgment motion is granted, and (2) Burland's cross-motion for summary judgment is denied.

II.   Background

    A.   *Factual History*

Burland and Richard T. Cole, Jr. founded Associated Community Services, Inc. ("ACS") in February 1999. (ECF No. 48-1, PageID.575; ECF No. 51-3, PageID.967, Tr. 12:7-13:8; ECF No. 51-5, PageID.1051, Tr. 16:22-23).  ACS fund-raised for charitable causes and political campaigns through telemarketing campaigns. (ECF No. 51-7, PageID.1155, Tr. 40:20-41:19).  Burland and Cole served as ACS's co-presidents. (ECF No. 51-3, PageID.967, Tr. 12:15-17; ECF No. 51-7, PageID.1158, Tr. 53:8-9).  They both owned 50 percent of ACS's voting shares.[2] (ECF No. 51-5, PageID.1051, Tr. 17:9-14; ECF No. 51-7, PageID.1158, Tr. 53:8-9; *see also* ECF No. 48-3, PageID.631; ECF No. 48-4, PageID.644; ECF No. 51-1, PageID.951; ECF No. 52-1, PageID.1797, 1811, 1824, 1835, 1867, 1880, 1890).

---

[2] ACS's 2001 corporate tax return indicates that Burland owned 100 percent of the company's shares. (ECF No. 52-1, PageID.1788).

From July 1999 through June 2005, ACS retained a company known as Assurion, Inc. as a professional employer organization.[3] (ECF No. 49-1; ECF No. 51-5, PageID.1053-54, Tr. 25:10-26:8). Among other things, Assurion leased its employees to ACS, administered ACS's payroll, withheld employment taxes from the employees' wages, and remitted those taxes to the Internal Revenue Service. (ECF No. 49-1; ECF No. 51-5, PageID.1054, Tr. 26:22-27:4). But in June 2005, ACS terminated its business with Assurion and hired CO-HR, LLC. (ECF No. 51-5, PageID.1053-54, Tr. 25:10-14, Tr. 26:10-27:4; ECF No. 51-9, PageID.1305, Tr. 22:1-5).

ACS structured its relationship with CO-HR differently than with Assurion. CO-HR did not function as a PEO; it did not lease employees to ACS. (ECF Nos. 49-1, 49-2). ACS instead hired its own employees and compiled payroll data that it would forward to CO-HR. (ECF Nos. 48-5, 49-9, 50-2; ECF No. 51-8, PageID.1260, 1263-64, Tr. 44:7-12, 57:5-58:20; ECF No. 52-1, PageID.1866, 1879, 1889). CO-HR used this data to generate payroll checks, it delivered those checks to ACS, and

---

[3] Professional employer organizations (PEOs) "provide human resource services to small and mid-size businesses" and pay "wages and taxes under the PEO's [employer identification number]." The PEO "typically remits wages and withholdings of the worksite employees and reports, collects and deposits employment taxes with local, state and federal authorities. The PEO also issues the Form W-2 for the compensation paid by it under its [employer identification number]." National Association of Professional Employer Organizations, Frequently Asked Questions About PEOs, https://napeo.org/intro-to-peos/faqs/ (last visited May 13, 2026).

remitted any withheld federal employment taxes to the IRS on ACS's behalf. (ECF No. 51-8, PageID.1259-60, 1263-64, 1266, Tr. 39:1-6, 44:7-12, 57:5-58:20, 66:7-17). CO-HR then invoiced ACS for an amount equal to the employees' wages and any corresponding unemployment and withheld employment taxes. (*Id.*, PageID.1282, Tr. 131:23-132:14; ECF No. 51-9, PageID.1340-41, Tr. 165:18-166:1; ECF No. 51-11, PageID.1448, Tr. 22:17-24).

Over time, significant discrepancies emerged between CO-HR's invoices and the amount ACS paid towards those invoices. This was because ACS's checks did not always cover the full amount that CO-HR invoiced. (ECF No. 51-3, PageID.988, Tr. 96:1-9, 18-24; ECF No. 51-5, PageID.1066, Tr. 76:7-11; ECF No. 51-8, PageID.1273, Tr. 94:2-25, Tr. 151:5-8; ECF No. 51-9, PageID.1347, Tr. 190:8-15). By 2007, CO-HR calculated the shortfall at $3 million approximately. (ECF No. 49-5, PageID.770). And ACS's own financial statements reflected $2.8 million in unpaid withholding taxes. (ECF No. 48-15, PageID.692, Lines 2010, 2020).

CO-HR informed ACS in September 2008 that it would no longer deposit ACS's withheld employment taxes with the IRS. (ECF No. 48-12, PageID.682; ECF No. 51-8, PageID.1270, 1282, Tr. 85:1-11, Tr. 131:12-18; ECF No. 51-9, PageID.1327, Tr. 110:19-111:9). ACS would have to deposit those funds with the government directly. (ECF No. 51-8, PageID.1270, Tr. 84:2-11; ECF No. 51-9,

PageID.1342, Tr. 170:3-23). The two companies parted ways in May 2009. (ECF No. 51-9, PageID.1327, Tr. 110:2-6).

ACS's problems continued to mount from then. In September 2012, the IRS filed a notice of federal tax lien with the Michigan Department of State for ACS's unpaid withholding and unemployment tax liabilities. (ECF No. 49-4, PageID.740). The lien amount totaled $5.4 million approximately, including unpaid withholding taxes for all the quarters in 2005 and 2006. (*Id.*). The IRS also assessed Burland and Cole with civil penalty liabilities for failing to timely remit ACS's withheld employment taxes to the government pursuant to 26 U.S.C. § 6672. (ECF No. 50-1, PageID.834, 844, 858, 869, 875). The December 2012 assessments covered outstanding balances for all the quarters in 2008 and the first quarter in 2010, amounting to $3.4 million approximately. (*Id.*).

ACS eventually declared Chapter 11 bankruptcy in March 2014. (*In re Associated Community Services, Inc.*, Bankr. E.D. Mich. No. 14-44095, ECF No. 1). The IRS filed a proof of claim with the bankruptcy court, approximating $14.2 million in unpaid taxes as of January 2017. (ECF No. 53-2. PageID.1920). After objecting to the IRS's amended proof of claim, ACS settled those objections with the government in April 2017. (ECF No. 64-6, PageID.2245-52). The settlement authorized the IRS to "file suit to obtain a money judgment" against Burland and

5

Cole for the outstanding civil penalty liabilities to "protect the statute of limitations" on recovering those taxes. (*Id.*, PageID.2249-50, ¶ 10).

B.     *Procedural History*

In December 2022, the government filed this lawsuit against Burland, Cole's estate, and Cole's surviving spouse, in her capacity as the estate's *de facto* executor or administrator.  The complaint seeks to, among other things, reduce to judgment the civil penalty liabilities already assessed against Burland. (ECF No. 1, PageID.5-6, ¶¶ 16-21).  The following chart reflects the assessed amounts for each quarterly tax period:

| Quarterly Tax Period | Assessment Date | Amount Assessed | Unpaid Balance as of 10/27/2022 |
|---|---|---|---|
| March 31, 2008 | 12/06/2012 | $725,754.76 | $154,187.43 |
| June 30, 2008 | 12/06/2012 | $726,724.35 | $755,429.68 |
| September 30, 2008 | 12/06/2012 | $781,759.68 | $818,814.70 |
| December 31, 2008 | 12/06/2012 | $356,711.74 | $447,703.89 |
| March 31, 2010 | 12/06/2012 | $811,919.11 | $1,182,465.11 |
| December 31, 2012 | 03/31/2014 | $697,023.18 | $969,971.23 |
| Total: | | | $4,328,572.04 |

(*Id.*, PageID.6, ¶ 19).

The government, Cole's estate, and Cole's surviving spouse entered into a stipulated judgment on February 3, 2025. (ECF No. 45).  The government and Burland – the only remaining defendant – now cross-move for summary judgment

on the question of Burland's liability for the assessed civil penalties. (ECF Nos. 46-47).

III.   Legal Standards

A moving party is entitled to summary judgment where the "materials in the record" do not establish the presence of a genuine dispute as to any material fact. Fed. R. Civ. P. 56(c).  All the evidence, along with all reasonable inferences, must be viewed in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

IV.   Analysis

*A.   Trust-Fund Tax Overview*

The Internal Revenue Code requires employers to withhold income and Federal Insurance Contributions Act (comprising Social Security and Medicare) taxes from employee wages and to deposit the withheld funds in the United States Treasury. *See* 26 U.S.C. §§ 3102(a), 3402(a); 26 C.F.R. §§ 31.3102-1, 31.6011(a)-1, 31.6011(a)-4.  "The withholding taxes are part of the wages of the employee, held by the employer in trust for the government; the employer, as a function of administrative convenience, extracts money from a worker's paycheck and briefly holds that money before forwarding it to the IRS." *Bell v. United States*, 355 F.3d 387, 392 (6th Cir. 2004) (quotation omitted).  "An employer who fails to pay taxes withheld from its employees' wages is . . . liable for the taxes which should have

7

been paid." *Slodov v. United States*, 436 U.S. 238, 243 (1978).  These taxes are also known as "trust-fund" taxes. *See Byrne v. United States*, 857 F.3d 319, 321 n.1 (6th Cir. 2017)

The Internal Revenue Code authorizes the government to "hold certain employers personally liable" for failing to remit trust-fund taxes to the Treasury. *Id.* at 327.  26 U.S.C. § 6672(a) demands personal liability for unpaid trust-fund taxes of "[a]ny person required to collect, truthfully account for, or pay over" the tax and "who willfully fails" to do so.  "[A]n individual is liable under § 6672(a) if he or she: 1) is responsible for paying the taxes and 2) willfully fails to turn over the tax money to the government." *Bell*, 355 F.3d at 393.  The taxpayer carries "the burden of proving by a preponderance of the evidence either that he is not a responsible person or that his failure to pay taxes was not willful." *Byrne*, 857 F.3d at 327; *see also Cline v. United States*, 997 F.2d 191, 194 (6th Cir. 1993).

### B.    Responsible Person

The first question to decide is whether Burland qualifies as a person who was responsible for paying ACS's trust-fund taxes to the IRS.  The answer is yes.

26 U.S.C. § 6671(b) defines "person" to include "an officer or employee of a corporation, or a member or employee of a partnership, who as such officer, employee, or member is under a duty to perform the act in respect of which the violation occurs." *See also Slodov*, 436 U.S. at 245; *Byrne*, 857 F.3d at 327.

"Whether one is considered a person responsible for paying over such taxes to the government under section 6672 is a question focusing upon the degree of influence and control which the person exercised over the financial affairs of the corporation, and, specifically, disbursements of funds and the priority of payments to creditors." *Kinnie v. United States*, 994 F.2d 279, 283 (6th Cir. 1993) (quotation omitted).

The United States Court of Appeals for the Sixth Circuit examines the following factors to determine whether a person is responsible for paying trust-fund taxes to the government:

> (1) an officer's duties, according to the corporate by-laws;
>
> (2) the individual's ability to sign corporate checks;
>
> (3) the identity of the officers, directors, and shareholders of the corporation;
>
> (4) the identity of the individuals who hired and fired employees; and
>
> (5) the identity of the individuals who are in control of the financial affairs of the corporation.

*Id.*; *see also Noronha v. I.R.S.*, 352 F. App'x 18, 19 (6th Cir. 2009).  "[L]iability requires the existence of only significant as opposed to absolute control of the corporation's finances." *Kinnie*, 994 F.2d at 283.

Burland's role with ACS satisfies most of these factors.  He founded ACS with Cole and acted as the company's co-president. (ECF No. 51-5, PageID.1051, Tr.

16:11-15; ECF No. 51-7, PageID.1158, Tr. 53:8-9).  He owned 50 percent of ACS's corporate shares. (ECF No. 51-5, PageID.1051, Tr. 17:9-14; ECF No. 51-7, PageID.1158, Tr. 53:8-9; *see also* ECF No. 48-3, PageID.631; ECF No. 48-4, PageID.644; ECF No. 51-1, PageID.951; ECF No. 52-1, PageID.1797, 1811, 1824, 1835, 1867, 1880, 1890).  Burland possessed the authority to issue and sign corporate checks. (ECF No. 48-2; ECF No. 51-4, PageID.1624, Tr. 42:6-43:7, 45:7-10).  He was the corporate officer responsible for providing ACS's financial information to the company's accountant so that she could prepare and file the corporate tax returns. (ECF No. 51-5, PageID.1669, 1687, Tr. 14:5-18, Tr. 89:21-90:6; *see also* ECF No. 48-16).  And he was the officer who signed ACS's 2006 and 2007 corporate tax returns. (ECF No. 48-3, PageID.630; ECF No. 48-4, PageID.643).  Perhaps most importantly, Burland acknowledged in a March 2009 IRS Collection Information Statement (Form 433-B) – *under penalties of perjury* – that he was responsible for depositing ACS's payroll taxes with the government. (ECF No. 50-5, PageID.895, 905).

Burland attempts to undermine these indications of responsibility by (1) raising factual questions as to his *actual* ability to issue and sign corporate checks, and (2) claiming that Cole furnished him with all the financial information that he ultimately forwarded to ACS's accountant. (ECF No. 46-2, PageID.258-61, 263-64, ¶¶ 2-8, 10, 15; ECF No. 56-2, PageID.1980-81, ¶¶ 3(a), 4).  But he cannot skirt his

10

own prior admission of responsibility for depositing ACS's payroll taxes with a blanket denial that "I have never agreed that I was a person responsible for the payment of withholding taxes by ACS . . . as I never had the power or authority within ACS to cause taxes to be paid or to make any expenditure of ACS funds." (ECF No. 56-2, PageID.1982, ¶ 6).   That type of evasion would violate the sham affidavit rule, which forbids a party from "creat[ing] a factual issue by filing an affidavit, after a motion for summary judgment has been made, which contradicts her earlier deposition testimony." *Reich v. City of Elizabethtown*, 945 F.3d 968, 976 (6th Cir. 2019).   And this same principle extends to previous tax documents – like the Collection Information Statement Burland executed – which is signed "under penalty of perjury." *United States v. Funds in the Amount of $30,670.00*, 403 F.3d 448, 466 (7th Cir. 2005); *see also James v. Hale*, 959 F.3d 307, 316 (7th Cir. 2020) ("We also disregard an affidavit that contradicts a statement made under penalty of perjury, even if the statement was not made in the course of litigation.").

Because of his critical admission of responsibility in the Collection Information Statement, coupled with his role as ACS's co-president and status as a 50 percent stakeholder, there is no genuine factual question as to whether Burland is a responsible person under section 6672(a).

C.    *Willfulness*

The next issue to address is whether Burland willfully failed to pay ACS's trust-fund taxes to the IRS. Again, the answer is yes.

Willfulness exists when the responsible person (1) "had knowledge of the tax delinquency and knowingly failed to rectify it when there were available funds to pay the government," or (2) "deliberately or recklessly disregarded facts and known risks that the taxes were not being paid." *Byrne*, 857 F.3d at 327 (quotation omitted).

Actual knowledge occurs when the responsible person "first becomes aware of a past due withholding tax liability after the liability has accrued" and "fails to use all unencumbered funds that come into his possession thereafter to pay the delinquent taxes." *Id.* (quotation omitted); *see also Huizinga v. United States*, 68 F.3d 139, 145 (6th Cir. 1995). Funds are encumbered "only where the taxpayer is legally obligated to use the funds for a purpose other than satisfying the preexisting employment tax liability and [the] legal obligation is superior" to the government's interest in the funds. *Byrne*, 857 F.3d at 327 (quotation omitted).

Recklessness occurs when the responsible person "disregards obvious or known risks that trust-fund taxes are not being paid to the Treasury and fails to investigate." *Id.* at 328; *see also Calderone v. United States*, 799 F.2d 254, 259-60 (6th Cir. 1986). The responsible person "cannot act recklessly (and therefore willfully) if he believed that the taxes were in fact being paid, so long as that belief

12

was, in the circumstances, a reasonable one." *United States v. Hartman*, 896 F.3d 759, 761 (6th Cir. 2018) (quotation omitted); *see also Byrne*, 857 F.3d at 329.

Burland was aware of trust-fund tax delinquencies for all the assessed tax periods. In March 2008, he created a reconciliation spreadsheet that compared CO-HR's employment tax invoices with ACS's payments to CO-HR for those same tax periods. (ECF No. 51-6, PageID.1119-20, Tr. 234:21-235:3; ECF No. 49-6). The spreadsheet revealed withholding tax underpayments amounting to $204,951.20 for the first quarter of 2008, $352,937.70 for the second quarter of 2008, and $574,156.70 for the third quarter of 2008. (ECF No. 49-6). He also signed ACS's quarterly employment tax returns for the fourth quarter of 2008, the first quarter of 2010, and the fourth quarter of 2012. (ECF No. 48-5, PageID.654; ECF No. 49-10, PageID.823; ECF No. 49-11, PageID.826). All the returns show withholding tax underpayments corresponding to the civil penalties the IRS later assessed against Burland. (ECF No. 50-1, PageID.869, 875, 881; ECF No. 48-5, PageID.653; ECF No. 49-10, PageID.822; ECF No. 49-11, PageID.825).

Yet Burland continued to draw a gross monthly salary from ACS in the amount of $20,425 through at least March 2009. (ECF No. 50-6, PageID.921-23). ACS loaned him $40,912.57 in tax year 2010 and an additional $9,920.52 by 2012. (ECF No. 51-2, PageID.963; ECF No. 58-5, PageID.2100, Line 1131). The company still paid employee salaries and wages, advertising fees, and funded employee benefit

programs in the combined amounts of approximately $24.4 million in tax year 2012 and $24.9 million in tax year 2013. (ECF No. 51-1, PageID.938; ECF No. 58-4, PageID.2077). And ACS authorized corporate loans to related entities that Burland and Cole owned together. For instance, ACS loaned $34,388 to related entities in 2010; in 2011, $90,576; and in 2012, $54,334. (ECF No. 51-2, PageID.963; ECF No. 58-4, PageID.2094; ECF No. 58-5, PageID.2100, Lines 1114, 1116, 1139, 1141).

Since Burland became aware of ACS's unpaid trust-fund taxes after they already "accrued," and he failed to use all the unencumbered funds that came into his possession to "pay the delinquent taxes," no reasonable jury could conclude that he lacked the requisite willfulness to avoid section 6672 civil penalties. *Byrne*, 857 F.3d at 327 (quotation omitted).

Burland disagrees with this conclusion. He maintains that Cole insisted that ACS pay its employees and vendors instead of its delinquent trust-fund taxes. (ECF No. 46-2, PageID.263, ¶ 14). And he asserts that it was Cole's idea for ACS to loan large sums of money to related entities that he co-owned with Burland rather than pay the IRS. (ECF No. 56-2, PageID.1981, ¶ 5; ECF No. 63-2, PageID.2140-41, ¶¶ 5-6). But Cole did not force Burland to draw a salary in 2009 while ACS's trust-fund taxes remained unpaid. Nor did he compel Burland to obtain sizable personal loans from ACS totaling $116,911.58 by December 31, 2011. (ECF No. 58-5, PageID.2100, Line 1130).

14

So how should Burland have responded to Cole's directives to pay ACS's creditors rather than the IRS?  The Sixth Circuit's guidance is clear: he could have, among other things, resigned from the company, shut it down, or forced ACS to file for bankruptcy (which it ultimately did). *See Bell*, 355 F.3d at 397; *see also Brewery, Inc. v. United States*, 33 F.3d 589, 593 (6th Cir. 1994) ("It is no excuse that . . . the money was paid to suppliers and for wages in order to keep the corporation operating as a going concern – the government cannot be made an unwilling partner in a floundering business.").  Burland's failure to pursue any of these options means that he cannot withstand summary judgment on the willfulness prong.

Next, Burland contends that CO-HR embezzled money from ACS, rendering the company unable to pay its trust-fund taxes. (ECF No. 46-2, PageID.263, ¶ 13; ECF No. 56, PageID.1954, ¶¶ 16, 18).  Aside from his own statements, there is no evidence supporting this theory.  CO-HR's managing director, Kleppe Houston, testified that he conferred with Burland and Cole some time in 2008 about reconciling CO-HR's invoices with ACS's payroll and trust-fund tax payments. (ECF No. 51-10, PageID.1378, Tr. 247:6-7).  But ACS "[n]ever showed" Houston how it determined that CO-HR owed any money to ACS.  So the issue "never got resolved." (*Id.*, PageID.1378, Tr. 246:20-22).  And according to Houston, ACS "never . . . produce[d] anything where . . . we could reconcile.  I was the only one

15

producing any information at all to try to get something started, and it never materialized." (*Id.*, PageID.1381, Tr. 258:16-24).

Burland does point to an October 2008 letter from Houston to Cole as evidence of CO-HR's embezzlement. (ECF No. 56-4, PageID.1993). All the letter says, however, is that CO-HR mistakenly collected "1.5% of gross wages on top of the required payroll invoicing" from June 2005 through December 2007; that the total overpayment amounted to $471,655.24; and that CO-HR would return the overpayment "as quickly as possible" in the form of an invoice credit. (*Id.*). The letter does not admit that CO-HR engaged in any culpable misconduct. And the stated overpayment does not relate to any of the tax periods subject to this litigation. (*Id.*). What is more, since ACS had already severed its relationship with CO-HR in May 2009, CO-HR's purported malfeasance could not possibly affect the trust-fund taxes ACS failed to pay in the first quarter of 2010 and fourth quarter of 2012. (ECF No. 51-9, PageID.1327, Tr. 110:2-6).

Burland's remaining arguments lack merit as well. His assertion that CO-HR is the entity that actually employed ACS's workers and, therefore, CO-HR and its officers are responsible for the 2008 trust-fund tax deficiencies is entirely unsubstantiated. (ECF No. 46-2, PageID.262, ¶ 11; ECF No. 51-7, PageID.1180-81, Tr. 141:23-142:24). ACS's tax returns directly refute this supposed arrangement. The employment tax returns for the third quarter of 2007, fourth quarter of 2008,

16

and first quarter of 2009 designate ACS as the employer, with ACS's employer identification number, and show sizable payments towards ACS's employee wages. (ECF Nos. 48-5, 49-9, 50-2). The third quarter 2007 return even lists CO-HR as the paid return preparer – *not* the employer. (ECF No. 49-9, PageID.820). Burland signed all these returns in his capacity as ACS's co-president. (ECF No. 48-5, PageID.654; ECF No. 49-9, PageID.820; ECF No. 50-2, PageID.887). And ACS's corporate tax returns for tax years 2006 through 2008 reflect hefty deductions for the payment of employee wages – deductions that ACS could not have claimed if CO-HR employed ACS's workers. (ECF No. 52-1, PageID.1866, 1879, 1889; *see also* ECF No. 51-8, PageID.1275, Tr. 102:14-22). Burland signed the 2006 and 2007 corporate tax returns too.[4] (ECF No. 52-1, PageID.1866, 1879).

---

[4] CO-HR's unexecuted Consulting and Administrative Service Agreement with ACS confirms that CO-HR did not employ ACS's workers. (ECF No. 49-2). The agreement is explicit that:

> ***Client acknowledges and agrees that no shared employment, co-employment or joint employment relationship is created by this contract or otherwise between Client and CO-HR***. CO-HR is only providing administrative services to Client's employees and is not providing temporary, contract or ***leased employees*** as defined under the Internal Revenue Code § 414(n).

(*Id.*, PageID.732) (emphasis added). Although it is unsigned, Burland does not directly refute that the agreement supplied a common understanding between ACS and CO-HR about their working relationship. In fact, ACS's corporate and employment tax returns evidence this same arrangement.

17

Burland's position that the assessed trust-fund tax liabilities are time-barred is equally unavailing. The government timely commenced this collection action within 10 years after the IRS assessed the trust-fund taxes against Burland. (ECF No. 1; ECF No. 50-1, PageID.834, 844, 858, 869, 875, 881). *See* 26 U.S.C. § 6502(a)(1) (establishing a 10-year statute of limitations running from the assessment date of the imposed tax).

The IRS also timely assessed the trust-fund taxes against Burland. The IRS assessed the first quarter 2010 and fourth quarter 2012 taxes within three years of when those tax periods concluded – March 31, 2010 and December 31, 2012. (ECF No. 50-1, PageID.875, 881). *See* 26 U.S.C. § 6501(a), (b)(2). And it assessed the first through fourth quarter 2008 taxes within 30 days after the IRS resolved Burland's administrative appeal of the proposed assessments for those tax periods – the agency resolved the appeal on November 29, 2012 and assessed the 2008 trust-fund taxes on December 6, 2012. (*Id.*, PageID.834, 844, 858, 869). *See id.*; 26 U.S.C. § 6672(b)(1), (3)(B).

Because there is no genuine issue of material fact as to whether Burland was responsible for paying over ACS's trust-fund taxes and willfully failed to do so, the government is entitled to summary judgment on all the assessed tax periods. Accordingly,

18

IT IS ORDERED that the government's motion for summary judgment (ECF No. 47) is granted.

IT IS FURTHER ORDERED that Burland's cross-motion for summary judgment (ECF No. 46) is denied.

Dated: May 15, 2026                          s/ Robert J. White
                                             Robert J. White
                                             United States District Judge

19